Circuit Court of Appeals, Third Circuit.

Feb. 7, 1938.

### In re JOHNSON et al.
Patent Appeal No. 3866.

Court of Customs and Patent Appeals.

March 7, 1938.

John N. Landberg, of Philadelphia, Pa., for appellant.

Joseph R. Byars, of Lancaster, Pa., for appellee.

Before BUFFINGTON and BIGGS, Circuit Judges, and WATSON, District Judge.

Charles E. Riordon and C. Russell Riordon, both of Washington, D. C., for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

Appellants have appealed to this court from the decision of the Board of Appeals of the United States Patent Office affirming that of the examiner which rejected claims 1 to 16, inclusive, 23 to 27, inclusive, and 29 to 46, inclusive. Claims 17 to 22, inclusive, and 28 were previously cancelled.

The claimed invention relates to the product and to a process of producing a stable borate from hydrous boron bearing natural ore. The process comprises first separating impurities from the ore by means of a magnetical and mechanical separator. The purified ore is then heated at a temperature of from 230° to 250° F. which is slightly above the boiling point of water. Appellants' purpose is to obtain a purified and stable borate substantially equivalent to octohedral borax. This borax contains 47.81 per centum $B_2O_3$ (a borate radical), five molecules of water, and is quite stable. Other hydrous borates contain varying percentages of $B_2O_3$ and are unstable; that is, they will, under some conditions, dry out and throw off moisture, and under others will absorb moisture. Appellants do not contend they first discovered that octohedral borax is stable. The drawing discloses a machine for performing the process, in which the natural ore is fed from a hopper through a magnetic separator including three successive rotors. There is a hopper for the cleaned borate materials which run from the hopper through a spout into a rotary dryer.

The references relied upon are:
Thomas (British), 2,414, of 1879.
Rowand, 1,068,453, July 29, 1913.
Dutton et al., 1,146,140, July 13, 1915.
Rasor, 1,487,806, March 25, 1924.
British patent, 330,146, June 5, 1930.
British patent, 342,174, January 29, 1931.
French patent, 726,813, March 14, 1932.

Claims 1 and 38 are typical, and are as follows:

"1. The process of producing a highly purified and concentrated, stable, borate ore from hydrous boron bearing ore which comprises removing, naturally occurring constituents therefrom by first magnetically separating impurities from the borate in the ore, and thereafter separating water of crystallization from the borate to increase the original stability thereof."

"38. A highly purified and concentrated, stable borate ore, produced from naturally occurring boron bearing material containing impurities and hydrous borate material having an unstable content of water of crystallization, said stable ore being characterized by the fact that it does not contain in excess of approximately three tenths of one per cent iron content, that its water content is approximately 10% less than that of the material employed in producing the stable borate ore, and that the apparent density thereof is substantially less than that of the employed material."

Method claims 1, 11, 12, 16, 23 to 27, inclusive, and 29 to 37, inclusive, all involve magnetic separation followed by dehydration, some of the claims showing

details of the magnetic separation step and others details of the dehydration step. They were all rejected as unpatentable over the patent to Rasor or British patent 330,146, in view of the Rowand patent or the French patent.

The Rasor patent discloses a process of, first, calcining colemanite, a borate ore; second, dividing it from its gangue by screening; and then separating the borate from impurities by flotation or other mechanical means.

The French patent and the Rowand patent appear to disclose magnetic separators substantially similar in every detail to the separator which is recited in the claims. The separation of magnetizable matter from other material by means of the magnet, however, is old and well known. It is shown by British patent 342,174, British patent 2,414 of 1879, and the Dutton patent.

■ We can see no force to the argument of appellants in which they urge that: "There is a big distinction between treatment of iron ore to recover the iron and treatment of hydrous borate mineral ore to eliminate iron impurities, together with mica and shale." It seems to us that it would make no difference, as far as the issue here is concerned, whether the magnetizable material goes to waste or is saved, so long as the separation takes place.

■ The British patent 330,146 discloses dehydration of borate ore. This patent has to do entirely with a process of dehydrating borate dekahydrate ($Na_2B_4O_7$ $10 H_2O$), which is borax with ten molecules of water. The dekahydrate is changed to a monohydrate by passing the material successively through a series of five chambers under controlled conditions of temperature and humidity.

The board sets out the process of British patent 330,146 in its opinion, as follows: "Borax * * * is introduced into the first dehydrating chamber and heated from 50 to 100° C., which removes two molecules of water. This product is then dehydrated in the second chamber by heating from 65 to 150° C. to remove two additional molecules of water. In the third chamber two more molecules of water are removed by heating from 125 to 200° C. In the fourth chamber two more molecules of water are removed by heating from 175 to 260° C. In the last chamber one molecule of water is removed by heating from 225 to 325° C. The final product from the last chamber is $Na_2B_4O_7$. $H_2O$. In all of the chambers the temperature is controlled so that it is always below the melting point of the borax or below the point that the borax goes into solution in the remaining water of crystallization."

It is disclosed in British patent 330,146 that instead of a series of chambers, a single long chamber may be used. In the use of the single chamber the borax and air are passed from end to end, countercurrent to each other, and the borax subjected to dehydrating conditions from about one to three hours. In the instant application, a single long chamber is provided for the dehydration. It is not necessary here to translate the centigrade degrees of the British patent 330,146 into Fahrenheit; since it is by the application of heat that the water of crystallization is reduced by both the process in the patent and the process claimed in the application. The patent seems to clearly disclose a process of dehydration by which the ore is reduced to a stable condition, as may be seen from the following extract of the patent: *"While the process of the present invention is suitable for dehydrating borax to any desired extent* so as to secure a borax having less water than the dekahydrate, which contains about 47 per cent of water, the process of the present invention is of special value in dehydrating borax to reduce the percentage of water in the borax to between the limits of 8 per cent and 21 per cent, or to dehydrate the borax so that it possesses less water of crystallization than three molecules and contains at least one molecule of water." (Italics supplied.)

The board held: "It is obvious from the above that the patentee contemplates dehydrating to any desired degree. Obviously, therefore, this would include dehydrating so as to obtain octohedral borax containing five molecules of water. If dehydration is carried to this extent and stopped, it is obvious that a stable product would be obtained. We do not understand that applicants are the first ones to discover that octohedral borax is stable. Accordingly if that is known and a stable product is desired, the dehydration would obviously be carried to such an extent as to obtain a stable product." We believe this reasoning to be sound.

■ British patent 330,146 deals with commercial borax as its starting material, and, of course, it is only reasonable to

assume that this material had been purified from its original composition before entering into the dehydration process of the patent. Appellants contend that the magnetic separation step prior to the dehydration or calcination step is advantageous to the process.

The prior art shows magnetic separation before heating in British patent 2,414, and in the Dutton patent. This type of separation is shown during heating by British patent 342,174, and the patent of Rasor discloses mechanical separation after heating. It may be true, as urged by the appellants, that their process of separation may be more economical than that shown in the prior art, and it may be that in the operation of the process of appellants' claims more iron may be separated from the ore than in the processes of the references. In this connection the examiner's decision, affirmed by the board, held:

"It is not apparent that the magnetic separation renders the ore in better condition for the calcination except that it removes a certain portion of the impurities, an obvious advantage which would be equally true of any other purification method. Magnetic separation would have relatively little effect on the main body of the ore as its effect is weak and confined to the magnetizable impurities only. It appears that it would be more advantageous to apply it after calcination than before since the ore would then be in a better condition for separation of impurities (see Rasor, page 1, lines 24–40) but purification either before or after would be merely a question of operative expediency.

"Applicant lays some stress on the cheapness of this method of separation and the fact that separation of the iron can be carried so far as to leave less than 0.3 of 1% in the ore. This again is merely the exercise of good judgment on the part of the operator and not invention. Applicants have failed to show that the effects of the separation step as applied to the treatment of a borate ore are in any way unobvious. It is merely the application of an old purification step to a slightly different material."

We are in accord with this holding.

It seems quite clear that the method claims were properly rejected as not presenting invention over British patent 330,-146, in view of the references disclosing magnetic separation.

The examiner "conceded that the references do not show magnetic separation followed by calcination of a borate material." Appellants argue that, since the process disclosed in their claims is confined to the treatment of hydrous borates, the citation of any reference which may relate to a different material is improper. We cannot agree with this contention. In the case of In re Williams, 87 F.2d 499, 501, 24 C.C.P.A., Patents 861, the court said that: "A process does not become patentably new merely because it is applied to a different object or material. In re Dreyfus, 65 F.2d 472, 20 C.C.P.A. (Patents) 1204; In re Laughlin, 48 F.2d 921, 18 C.C.P.A. (Patents) 1239."

It appears, therefore, that British patent 2,414 of 1879, which disclosed magnetic separation followed by calcination in the treatment of phosphates, is a pertinent reference.

British patent 330,146 certainly discloses the process of dehydration by the exercise of which borate pentahydrate may be produced. Separation, both magnetical and mechanical, is disclosed by others of the references heretofore discussed. The combination of these references can undoubtedly be made, and, in our opinion, the combination shows that the steps of the process of the application are old, and no invention is involved in joining them.

In the case of In re Cordes, 76 F.2d 302, 304, 22 C.C.P.A., Patents, 1158, the court said: "In passing upon the patentability of combination claims we have frequently combined references and held that, in view of such references, an alleged new combination would be obvious to one skilled in the art, and hence unpatentable. * * * Therefore, the new combination did not require the exercise of the inventive faculty."

Claims 1, 2, 8 to 16, inclusive, 23 to 27, inclusive, and 29 to 37, inclusive, were also rejected on the ground of aggregation. However, due to the views we have set forth, it is unnecessary to discuss this ground.

Product claims 38 to 44, inclusive, were rejected as unpatentable over the product of British patent 330,146. Appellants contend that: "The art of record fails to disclose * * * a stable product resultant from any process."

The process of dehydration in appellants' claims results in the production of

sodium borate pentahydrate, a stable product from sodium borate dekahydrate. In other words, from sodium borate ore containing ten molecules of water we take away five molecules of water and have remaining sodium borate ore with five molecules of water. The sodium borate monohydrate produced by the process of the British patent 330,146, as there disclosed, "retain essentially the same shape and size as those of the originally hydrated material (dekahydrate)." As has been heretofore mentioned, the patentee contemplated dehydrating to any desired stage, and, since the crystals of borate ore retain the same shape and size throughout the process, it seems clear to us that the product of the application could be made by the process of the patent, if the dehydration of the patent were stopped after five molecules of water had been removed, or if six were removed and one reabsorbed. This product would correspond to the pentahydrate product of appellants' claims, and would necessarily possess the same quality of stability. The removal of the iron content to any desired point is merely one of degree and is obvious.

In the case of In re Corkill, 87. F.2d 216, 218, 24 C.C.P.A., Patents, 815, this court held that the product, which seems to be substantially identical with the product of the claims herein, "is also fully disclosed by the British patent." British patent 330,146. The chief difference between the product here and that claimed in the case cited would seem to be that the product here is stated to contain not more than three-tenths of one per centum iron. Since the patent tribunals have held, and we agree with the holding, that the removal of the iron content is an obvious expedient, we do not believe the presence or absence of the fraction of iron makes a product of different character in a patent sense. Moreover, British patent 330,146 does not describe any iron in the borax product, so that the claim showing a product containing less than any stated amount of iron could not be said to be patentable over a disclosure which makes no mention of any iron being present. Even if we were to assume that the product

of the British patent 330,146 is not as pure, by reason of the presence of iron, as that claimed by appellants, this cannot, as we view it, render the product of the claim patentable.

The case of In re Ridgway & Glaze, 76 F.2d 602, 603, 22 C.C.P.A., Patents, 1169, seems to be determinative here. We said: "While appellants might be entitled to a patent on a method of purifying alpha alumina, they would not be entitled to a patent on the article alpha alumina, a natural product, merely because of the degree of purity of the article."

Apparatus claims 45 and 46 were not discussed separately by the examiner nor in the brief of appellants. The Board of Appeals held these claims unpatentable, and we think properly so, for the same reasons it rejected the process claims.

Both of these claims, in substance, set forth a system which comprises series of means for separating, for heating the mineral after separation, for control of temperature, and for recovering the product. It will be seen that they merely set forth means for carrying out the process and are so linked to the process claims as to substantially cover the same subject-matter as the process claims. In our opinion they were properly rejected by the board. The case of In re Thompson, 62 F.2d 90, 92, 20 C.C.P.A., Patents, 725, cited by the solicitor, we believe to be applicable, wherein the court quoted, with approval, the following language of the Board of Appeals: "It is evident that the only difference is that in claim 3 of the patent appellant has set forth a series of steps for doing certain things in succession while in this application the claim merely calls for a series of means for doing the same things in the same successive order. In our opinion there is no substantial difference in the scope of subject-matter covered by the two claims."

We are of opinion that the Board of Appeals committed no error in rejecting appellants' claims here involved, and its decision is, therefore, affirmed.

Affirmed.